IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARIE A. PALMER,** | **CASE NO. 1:15-cv-00704-SHR-GBC** |
| **Plaintiff,** | **(JUDGE RAMBO)** |
| | **MAGISTRATE JUDGE COHN** |
| **v.** | |
| **CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY,** | **REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL** |
| **Defendant.** | **Doc. 1, 9, 10, 11, 16, 17** |

## REPORT AND RECOMMENDATION

### I.   Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Marie A. Palmer ("Plaintiff") for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act"), and Social Security Regulations, 20 C.F.R. §§404 *et seq.*, 416 *et seq.* (the "Regulations").[1]   With regard to mental impairments, the ALJ's decisions is supported by a statement from Plaintiff's treating therapist that she had only moderate limitations, a statement from her treating PA-C that her depression would only cause disabling limitations for seven months, a consultative

---

[1] Part 404 governs disability insurance benefit applications and Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

examining opinion, treatment notes, and Plaintiff's conservative treatment. Doc. 10. Plaintiff submitted a medical opinion from her psychiatrist supporting her claim, but does not establish that no reasonable person would have resolved the conflict in evidence against the psychiatrist's opinion in favor of the examining opinion, therapist's statement, PA-C's statement, treatment notes, and conservative course of treatment. Doc. 10.  No medical opinion supports Plaintiff's claims with regard to physical function, and a consultative examining opinion indicates that Plaintiff can perform a range of light work. Doc. 10. The ALJ properly discounted Plaintiff's credibility based on the medical opinions, lack of objective evidence, and inconsistencies in her claims. Doc. 10.

The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.* (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). For the foregoing reasons, the Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On August 1, 2011, Plaintiff applied for SSI. (Tr. 11). On May 29, 2012, the

Bureau of Disability Determination denied this application, (Tr. 49-60) and Plaintiff requested a hearing.  (Tr. 70-87). On September 12, 2013, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 24-48). On September 26, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 8-23). Plaintiff requested review with the Appeals Council, which the Appeals Council denied on February 9, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On April 10, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On June 16, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On July 30, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 11). On September 2, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 16). September 13, 2015, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 17). On September 10, 2015, the case was referred to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.    Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for

disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for

disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1)

whether the claimant is engaged in substantial gainful activity; (2) whether the claimant

has a severe impairment; (3) whether the claimant's impairment meets or equals a listed

impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the

claimant's impairment prevents the claimant from doing past relevant work; and (5)

whether the claimant's impairment prevents the claimant from doing any other work. *See*

20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine

Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears

the burden of proof at steps one through four.  If the claimant satisfies this burden, then

the Commissioner must show at step five that jobs exist in the national economy that the

claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The

ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a). Specifically, the Act provides that:

> An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require. An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.

42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i).

The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.* (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Relevant Facts in the Record

### a.  Age, education, and vocational history

Plaintiff was born in 1972 and was classified by the Regulations as a younger individual throughout the relevant period. (Tr. 17); 20 C.F.R. § 404.1563. Plaintiff has a limited education and past relevant work as a commercial cleaner and a packer. (Tr. 17, 40-41). Plaintiff reported jobs "off and on" from 2000 through 2005 and in November and December of 2009. (Tr. 190).

### b.  Physical impairments

Plaintiff alleges onset of January 1, 2010. (Tr. 11, 146). There is no record of treatment after her alleged onset date until December of 2010, when she presented to PA-C Nse Akpe for "pain all over her body." (Tr. 236). She reported pain, but examination was normal aside from an abdominal mass, with no neurological deficits. (Tr. 236). Plaintiff treated for gynecological complaints and cold symptoms through April of 2011. (Tr. 227-39, 253). There is no evidence of subsequent treatment prior to her application date in August of 2011. Doc. 10.

Plaintiff and her mother submitted Function Reports in August of 2011. (Tr. 170-84). Plaintiff reported that she was "in a lot of pain" and "just sits around," with no problem with personal care. (Tr. 165-70). She reported that she does not prepare meals because she did not "have a stable place to stay." (Tr. 170). She reported that she could clean, iron, and do laundry. (Tr. 170). She reported that she could walk, ride in a car, use transportation, and went outside alone daily. (Tr. 171). She reported that she could walk

"4-5" blocks and could not sit for too long. (Tr. 173). She reported that she did not use a cane. (Tr. 174). She reported that she had just started physical therapy. (Tr. 177). Plaintiff's mother reported "she can do most things but [is] always in pain." (Tr. 181). Plaintiff's mother's report is almost verbatim the same as Plaintiff's report, except that she reported problems getting along with others and walking more than one block. (Tr. 165-87).

On September 1, 2011, Plaintiff presented to PA-C Apke and reported "a lot of pain in her body." (Tr. 405). She reported that she was "not feeling tired or poorly," but had anxiety, depression, and insomnia. (Tr. 405). PA-C Apke scheduled laboratory testing. (Tr. 407).

Plaintiff underwent a consultative physical examination on October 26, 2011 with Dr. McLaughlin. (Tr. 273-74). Plaintiff reported asthma, pain and swelling in her bilateral knees, pain in her back, and pain in her right shoulder. (Tr. 271). She reported that she could not walk for more than two blocks. (Tr. 272). She denied using street drugs. (Tr. 273). Dr. McLaughlin observed antalgic gait,[2] that she needed help to arise from the examination table, and decreased range of motion in her bilateral knees. (Tr.

---

[2] Antalgic gait is a limp, specifically "[a] manner of walking or gait which aims to shorten as much as possible the length of time that a painful limb must support the weight of the body. In this manner of walking, the stance phase (during which the limb supports the weight of the body) is shortened." 1-A Attorneys' Dictionary of Medicine A-8187 (Matthew Bender 2014).

273, 276). Plaintiff reported pain on straight leg raise,[3] so it was not completed, and had a bilateral positive sitting root test. (Tr. 274). Examination of Plaintiff's cervical spine, shoulders, elbows, wrists, hands, knees, hips, and lumbar spine showed "minimal" swelling in the knees and back tenderness, with "no evidence of muscle weakness," no muscle spasm, redness, or warmth, no knee effusion, crepitus, or clicks, and normal curvature. (Tr. 275). Plaintiff had decreased range of motion in the hips, knees, and right shoulder. (Tr. 276). Plaintiff was not able to stand on one leg at a time without difficulty. (Tr. 275). Mental status examination indicated that Plaintiff "was awake, alert and oriented to time, place, and person and was able to engage in appropriate conversation, answer questions appropriately and follow directions. Affect was appropriate to the situation." (Tr. 275). She had normal sensation, but difficulty walking and squatting. (Tr. 275). Dr. McLaughlin opined that Plaintiff could perform a range of light work, limited to walking one to two hours per day. (Tr. 280-81).

On December 19, 2011, PA-C Apke opined that Plaintiff would be disabled, but only for seven months, and not twelve months or more. (Tr. 283). PA-C Apke opined that she was not "a candidate for Social Security Disability or SSI." (Tr. 283).

---

[3] A straight leg raise test is performed "to diagnose inflammation of the sciatic nerve as it comes out of the low back or lumbar spine. Test is conducted with patient lying on his back. Keeping the leg straight, the patient raises it as far as possible. Most patients can have the leg raised almost straight up (90 degrees) without major pain. The patient with 'sciatica' experiences pain early in the movement of the leg. The physician should document, in terms of degrees of an angle, the level at which the raising of the leg caused pain." 7-3004 LAWYERS' GUIDE TO MEDICAL PROOF § 3004.03 (Matthew Bender 2016).

On December 23, 2011, Plaintiff established care with Dr. Matthew Kelly, M.D., for right knee pain. (Tr. 394). Dr. Kelly observed a mass consistent with a Baker's cyst[4] and Plaintiff reported pain with movement and palpitation. (Tr. 394). She had decreased range of motion and normal strength and sensation. (Tr. 394).   Diagnostic tests in December of 2011 and January of 2012 indicated several abnormalities in the right knee. (Tr. 394, 398). In February of 2012, she reported "pain with activity." (Tr. 392). Examination indicated tenderness and "slight posterior swelling, but…good range of motion without pain" and intact sensation. (Tr. 392). Dr. Kelly provided a patellar J-brace, and instructed her to contact him if she had "any further problems." (Tr. 392). He did not schedule a follow-up visit. (Tr. 392).

In December of 2011 and January of 2012, Plaintiff began reporting abdominal pain. (Tr. 333, 371). She went to the emergency room and then the Women's Clinic at Community Health Center. (Tr. 333).  She had no focal motor or sensory deficits. (Tr. 376). In April of 2012, she presented to the emergency room and reported flank pain and urinary problems. (Tr. 364). Plaintiff had normal gait with normal neurological and extremity examinations. (Tr. 368). Plaintiff was discharged home with instructions to follow-up with her gynecologist and was "ambulating without assistance." (Tr. 365).

---

[4] A Baker's cyst is a "cyst filled with synovial fluid (the fluid that lubricates joints), located in the popliteal space behind the knee." 1-B Attorneys' Dictionary of Medicine B-14081 (Matthew Bender 2014). "The cyst will often disappear spontaneously. Using a compression wrap, icing the knee, and elevating the leg may be helpful in relieving symptoms. In some cases, needle aspiration may be performed to drain synovial fluid from the cyst. A corticosteroid is sometimes injected into the knee to reduce inflammation. If the cyst does not resolve and continues to cause pain or limit knee function, it can be removed surgically, but may recur." 1-B Attorneys' Dictionary of Medicine B-14083 (Matthew Bender 2014).

Later that month, she reported to PA-C Apke that she had "no musculoskeletal symptoms." (Tr. 403).

In June of 2012, Plaintiff underwent a hysterectomy and removal of her ovaries that indicated "borderline" ovarian cancer. (Tr. 329, 357). There was no "gross residual" and no adjuvant treatment was indicated. (Tr. 329). The cancer was "confined to the ovary." (Tr. 323). In August of 2012, Plaintiff had a post-operative visit with "no complaints." (Tr. 328). She was discharged from cancer treatment and instructed to return to the Women's Clinic. (Tr. 328).

In August of 2012, Plaintiff presented to PA-C Apke for a referral for hernia treatment. (Tr. 402). She was "not feeling tired or poorly." (Tr. 402). She reported knee symptoms and no pulmonary symptoms. (Tr. 402). Examination indicated a mass in her knee and abnormalities in her abdomen. (Tr. 402).

In September of 2012, Plaintiff returned to Dr. Kelly reporting that her knee symptoms had "recently worsened." (Tr. 390). Dr. Kelly noted that "evaluation of the right knee today is better than it was before. She can extend it fully and flex it to about 120 degrees." (Tr. 390). She had a Baker's cyst, but no swelling or tenderness and intact sensation. (Tr. 390). Dr. Kelly aspirated Plaintiff's Baker's cyst. (Tr. 390). He indicated that if the aspiration did not give Plaintiff symptomatic relief, he would "recommend arthroscopy to evaluate the patellofemoral joint and remove any possible loose bodies that occurred from her subluxation episode. She is amenable to this and she will follow

up in four to six weeks' time." (Tr. 390). There is no evidence of subsequent treatment for her knee or back in the record. Doc. 10.

In October of 2012, Plaintiff presented for treatment of a hernia and reported "low grade pain, perhaps 3/10" in her abdomen. (Tr. 336). Plaintiff exhibited "normal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (Tr. 340). Plaintiff had intact memory, normal insight and judgment, and appropriate mood and affect. (Tr. 341). She had a "soft tissue mass in the right groin that could easily be….a hernia" and was scheduled for an ultrasound. (Tr. 341). Plaintiff's ultrasound was "not definitive" and she was scheduled for an exploration of the right groin. (Tr. 346). At the hearing a year later, Plaintiff testified that the exploration still had not been performed. (Tr. 34).

In November of 2012, she presented to the emergency room after twisting her ankle in an altercation. (Tr. 352). Plaintiff "smell[ed] of [alcohol]" and was writhing on the bed. (Tr. 352). Examination indicated tenderness, but normal range of motion, sensation, and motor strength. (Tr. 352). She was prescribed Vicodin with no refills. (Tr. 354).  Objective testing indicated abnormalities. (Tr. 349, 396). Six days later, Plaintiff followed-up with Dr. Kelly. (Tr. 389). Dr. Kelly wrote that Plaintiff had been "well until six days ago when she fell injuring her right ankle." (Tr. 389). She underwent ankle surgery two weeks later. (Tr. 349, 396). On November 29, 2012, Plaintiff followed-up with Dr. Kelly. (Tr. 388). He noted that she was "doing quite well." (Tr. 388). He placed

her in a cast for six weeks. (Tr. 388). In January of 2013, Dr. Kelly noted Plaintiff was doing "quite well" with her ankle in "excellent position." (Tr. 387). He prescribed physical therapy and wrote that "I told her at this point she can participate in activities as tolerated. If there is anything I can do for her in the future, she is to bring it to my attention." (Tr. 387).  Dr. Kelly's notes mention no knee or back complaints. (Tr. 387-89).  There is no evidence of subsequent treatment with Dr. Kelly. (Tr. 387).

On January 17, 2013, Plaintiff followed-up with PA-C Apke for a "routine" physical examination. (Tr. 400). Plaintiff reported that she had an appointment with Dr. Kelly in March of 2013. (Tr. 400). Plaintiff reported that she was "not feeling tired or poorly." (Tr. 401). She had "no pulmonary symptoms…no anxiety and no depression." (Tr. 401). Her only musculoskeletal complaint was ankle pain. (Tr. 401). Examination was normal. (Tr. 401).

Plaintiff attended physical therapy for one month, from January to February of 2013. (Tr. 414). She discontinued physical therapy when her prescription expired and she had transportation issues. (Tr. 414). There is no evidence of subsequent treatment for any physical impairment.  Doc. 10.

In September of 2013, Plaintiff testified that she could not lift anything more than a "plate of food" and could not walk more than one block. (Tr. 30, 35). She reported that she could sit for an hour and spent "a couple of hours" each day napping and lying down. (Tr. 30, 35). She testified that she could not shop or do laundry unassisted, and she only

got around with rides from her case manager or cabs. (Tr. 29). She testified that she could not dress herself. (Tr. 30). She testified that she had no medication side effects. (Tr. 31). She testified that her doctors had prescribed a cane and that she was anticipating further surgery and physical therapy. (Tr. 34). She testified that she had a walk-in shower for slip and falls. (Tr. 35). A VE testified that there were both light and sedentary jobs that Plaintiff could perform. (Tr. 39-48).

### c.  Mental impairments

Plaintiff applied for SSI on August 1, 2011, alleging that she had been disabled from physical and mental impairments since January of 2010. (Tr. 11, 146). Plaintiff did not begin mental health treatment until August of 2011, after she applied for SSI. (Tr. 313). At that time, she reported that she had never had any mental health treatment or mental health medications. (Tr. 316). She explained that she had been homeless since June of 2010 and had a history of cocaine addiction, but had been in recovery for about three years. (Tr. 310, 314). She reported that she had previously lived with her grandmother. (Tr. 310). She reported a history of legal problems for assault in 2007. (Tr. 310). She reported several symptoms of depression and anxiety. (Tr. 312).  She reported that she had not had any difficulty with verbal aggression, physical aggression, frequent anger, or arguments, and had "not been aggressive toward others." (Tr. 313). Mental status examination indicated cooperative behavior, good motivation for treatment, fair judgment, good memory and insight, appropriate thought content, logical thought

process, appropriate affect, depressed mood, soft speech, calm motor behavior, normal but minimally responsive speech, fair eye contact, good hygiene, and appropriate appearance. (Tr. 318).

Plaintiff and her mother submitted Function Reports in August of 2011. (Tr. 170-84). She reported that she socialized with friends and regularly went to church. (Tr. 172). She reported that she had no change in social activities since her illness began except for "getting around." (Tr. 173). She reported that she could pay attention for "as long as [she had] to," finishes what she starts, follows spoken instructions well, and sometimes has trouble with written instructions. (Tr. 173). She reported that she gets along well with authority figures, had never been fired for problems getting along with other people, handles changes in routine "ok," and does not handle stress well. (Tr. 174). Plaintiff's mother's report is almost verbatim the same as Plaintiff's report, except that she reported problems getting along with others and walking more than one block. (Tr. 165-87).

On September 8, 2011, Plaintiff had an initial treatment plan and evaluation at Riverside Associates. (Tr. 265). She reported a history of substance abuse, specifically alcohol, marijuana, and cocaine. (Tr. 265). Plaintiff reported that she had been in jail for four years for simple assault, drug paraphernalia, and a probation violation. (Tr. 265). Plaintiff explained that she had "self medicated with illegal drugs." (Tr. 265). Plaintiff was diagnosed with depression, PTSD, and history of polysubstance abuse with a GAF of 57. (Tr. 266).

On November 7, 2011, Plaintiff established a medication management plan at NHS. (Tr. 470). Her only diagnosis was recurrent moderate depression and her GAF was 55. (Tr. 470).

On November 17, 2011, Plaintiff's therapist at Riverside Associates opined that she had no more than moderate limitations in any area of work related function. (Tr. 262-63). Plaintiff attended therapy biweekly through December 16, 2011, once in January of 2012, and once in March of 2012. Plaintiff discontinued therapy after eleven visits. (Tr. 320-22). She was instructed to "re-engage in treatment at a later date if needed." (Tr. 321). Plaintiff later reported that she had discontinued because she was "overwhelmed with seeking housing and medical appointments" and planned to "resume in the near future." (Tr. 292).

Plaintiff established care with psychiatrist Dr. Vaglica in March of 2012. (Tr. 440). Plaintiff reported "moderate" and "intermittent" depression that would last for up to one day. (Tr. 440). She reported "normal energy and concentration." (Tr. 440). She reported significant symptoms of anger and irritability, with homicidal ideation, thoughts of hurting others, and throwing and breaking things when she gets angry. (Tr. 440). Plaintiff reported that she "occupied herself during the day with doctor's appointments and being out with friends." (Tr. 441). She was taking Celexa and trazodone prescribed by her primary care doctor, and Dr. Vaglica added Abilify. (Tr. 440).

In April of 2012, Plaintiff reported continued anger and depression, and Dr. Vaglica increased her Abilify. (Tr. 439). She reported depressed and anxious mood and flat affect, but mental status examination was otherwise normal, with no medication side effects, normal grooming, normal sleep, normal appetite, no suicidal or homicidal thoughts, cooperative behavior, and organized speech and thought. (Tr. 439).

In May of 2012, Plaintiff underwent a consultative examination with Dr. Dawn Crosson, Psy.D. (Tr. 293). Plaintiff reported that she had stopped using cocaine and marijuana in 2004. (Tr. 292). Plaintiff reported that she had been incarcerated for four years at the ages of 18 and 35. (Tr. 292). Dr. Crosson noted Plaintiff's subjective report of symptoms, but observed a normal mental status examination aside from sad mood and flat affect. (Tr. 294-94). She opined that Plaintiff "should be able to sustain attention, concentration and pace to satisfactorily perform in an 8 hour workday/ 40 hours per work week." (Tr. 293-94). Dr. Crosson opined that Plaintiff had no more than moderate impairment in any area of work related function. (Tr. 289).

On May 29, 2012, Plaintiff's claim was denied by the state agency. (Tr. 49-60). Plaintiff reported insomnia and denied anger in June and July of 2012, but examination was otherwise unchanged from April of 2012. (Tr. 436-37, 439). Plaintiff's treatment plan was updated in June of 2012 to note diagnoses of depression, anxiety, and PTSD, with a GAF of 55. (Tr. 466). On July 3, 2012, Plaintiff was evaluated for therapy at NHS. (Tr. 457). Plaintiff's diagnoses were anxiety, recurrent moderate depression, and PTSD.

(Tr. 459). Her GAF was 53. (Tr. 459). She reported that her only medical problems were asthma and acute nasopharyngitis. (Tr. 459).

Plaintiff obtained counsel later in July of 2012, and reported worsening symptoms to Dr. Vaglica in August of 2012. (Tr. 67-69, 435). For the first time, she mentioned mood swings and shopping obsessively, and began reporting anger again. (Tr. 434-35). The same month, Dr. Vaglica opined that Plaintiff had marked, work-preclusive mental limitations in social functioning, concentration, persistence, and pace, and episodes of decompensation, and would be absent more than four times per week. (Tr. 308). Dr. Vaglica based her opinion on symptoms like psychomotor agitation or retardation, difficulty thinking or concentrating, recurrent severe panic attacks, appetite disturbance, decreased energy, abnormal affect, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, persistent disturbances of mood or affect, emotional lability, and sleep disturbance. (Tr. 305).

In September and October of 2012, Dr. Vaglica noted that Plaintiff was "stable," with a GAF of 55, and that she was "quite stable lately and happy." (Tr. 433, 454). In September of 2012, her treatment was updated, she was noted to be "stable," and her GAF was 55. (Tr. 454). Her therapy treatment plan was updated in October of 2012 and indicated that she would continue therapy through February of 2013. (Tr. 447). There is no evidence of subsequent therapy services. (Tr. 447).

Dr. Vaglica's mental status examination in October and December of 2012 and February of 2013 indicated no medication side effects, clean grooming, normal sleep, normal appetite, no suicidal or homicidal thoughts, neutral mood with no depression or anger, cooperative behavior, and organized speech and thought process. (Tr. 432-33). Plaintiff reported in December that she had stable mood, was sleeping and eating well, no current stressors, and was reading, watching television, and visiting with her family. (Tr. 432). In January of 2013, her therapy treatment plan was updated, and she was assessed a GAF 60. (Tr. 445). Records indicate that she was a no-show ("N/S"). (Tr. 445). In February of 2013, she reported stable mood, adequate sleep and appetite to Dr. Vaglica. (Tr. 431). On February 8, 2013, her therapy treatment plan was updated, and she was instructed to continue therapy for the next three months. (Tr. 442). In June of 2013, Plaintiff reported agitation and excessive sleep to a CRNP after being off her medication for a month, but stable mood and no feelings of anxiety. (Tr. 430). There is no evidence of subsequent mental health treatment. Doc. 10.

In September of 2013, Plaintiff testified that she saw her psychiatrist "once a month" and that she was "waiting on a list now for a new therapist." (Tr. 37). She reported that she was depressed "all the time" and with a lot of anger, stress, and anxiety. (Tr. 37). She testified that she had not been to church "lately" and could only concentrate for an hour before she got tired. (Tr. 38).  She testified to significant problems sleeping. (Tr. 36).

On September 26, 2013, the ALJ found that Plaintiff was not disabled and not entitled to benefits. (Tr. 8-23).

## V.    Plaintiff Allegations of Error

### a.    Step two

Plaintiff asserts that the ALJ erred in evaluating her PTSD at step two. (Pl. Reply at 1-2) (citing SSR 96-3p; 20 C.F.R. §404.1521; Tr. 265-66, 440-41). Plaintiff reported a history of abuse in her childhood. (Tr. 265). She reported that this abuse caused anger and resentment. (Tr. 265). She also reported flashbacks, nightmares, avoidant behavior, irritability, anger, decreased sleep, decreased appetite, tearfulness, and passive suicidal ideation. (Tr. 440). Plaintiff carried diagnoses of anxiety, depression, and post-traumatic stress disorder ("PTSD"). (Tr. 266, 441).

Step two requires the ALJ to determine whether an impairment causes a "slight abnormality" in work-related function. SSR 96-3p; *see also* 20 C.F.R. §404.1521. However, even if an ALJ errs in finding that an impairment does not cause a slight abnormality, Plaintiff must establish this error was harmful. In several cases before the undersigned involving Plaintiff's counsel, Attorney Niven, the Court has explained that remand is not appropriate for an error at step two if Plaintiff "has not specified how that factor would affect the five-step analysis undertaken by the ALJ," or makes only a "generalized response," such as an assertion that the impairment "makes it more difficult for her to stand, walk and manipulate her hands and fingers." *Pleacher v. Colvin*, No.

1:13-CV-02756-GBC, 2015 WL 1470662, at *7 (M.D. Pa. Mar. 31, 2015) (quoting

*Rutherford v. Barnhart,* 399 F.3d 546, 553 (3d Cir.2005)); *see also Gorby v. Colvin*, No.

3:14-cv-2195 (M.D. Pa. Mar. 19, 2016) (Brief submitted by Attorney Niven asserted that

ALJ erred in assessing obesity at step two because it "could impact a claimant's

functioning" and "that her sleep disturbance 'could be exacerbated by her additional

weight.' (Pl. Reply at 2)....All of these are 'generalized responses' that do not

sufficiently identify why the ALJ's alleged error was harmful. *See Rutherford*, 399 F.3d

at 553"); *Snyder v. Colvin*, No. 4:15-cv-00389 (M.D. Pa. Mar. 14, 2016) (Brief submitted

by Attorney Niven "notes that SSR 02-1p provides that obesity and fatigue related to

obesity '***may***' cause work-related limitations. (Pl. Brief at 14) (emphasis added). Plaintiff

further asserts that the ALJ 'failed to consider the effect of Snyder's obesity, in

combination with her other impairments, on her ability to work on a sustained basis,'

because her left lower extremity pain '***could likely be*** exacerbated by her additional

weight.' (Pl. Brief at 14-15) (Pl. Reply at 2) (emphasis added). She asserts that obesity

'***can*** cause limitations of function in sitting, standing, walking, lifting, carrying, pushing,

pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to

tolerate extreme heat, humidity, or hazards.' (Pl. Reply at 1) (citing SSR 02-1p)

(emphasis added). Plaintiff asserts that the ALJ 'failed to consider' how Plaintiff's

'limitations of her depression and anxiety' affected her ability to work 'on a regular and

continuing basis.' (Pl. Brief at 23). Plaintiff does not further develop this argument.

These conditional assertions do not even rise to the level of the 'generalized response' rejected by the Court in *Rutherford*"); *Tolbert v. Colvin*, No. 114CV02194CCCGBC, 2016 WL 1458236, at *16 (M.D. Pa. Mar. 11, 2016), *report and recommendation adopted*, No. 1:14-CV-2194, 2016 WL 1450168 (M.D. Pa. Apr. 13, 2016) (Briefs submitted by Attorney Niven failed to support claim for step two remand where they cited only "lab tests identifying Hepatitis C and [provider's] diagnosis of 'chronic hepatitis with mild to moderate activity, compatible with hepatitis C virus infection and portal fibrosis'"); *Orndorff v. Colvin*, No. 114CV02465CCCGBC, 2016 WL 1458408, at *9 (M.D. Pa. Mar. 9, 2016), *report and recommendation adopted,* No. 1:14-CV-2465, 2016 WL 1450172 (M.D. Pa. Apr. 13, 2016) (Brief by Attorney Niven "cite[d] diagnoses for each of these conditions, and additionally cites her weight; her subjective reports of feeling tired, experiencing pain all over, increased thirst, polyuria, blurry vision, headaches, dizziness, 'not feeling right,' nausea, fatigue, burning and tingling in her legs, and orthostatic hypotension; and her elevated blood sugars," but "Plaintiff's citation to her subjective reports [was] like the 'generalized response' that *Rutherford* rejected") (citing *Shinseki v. Sanders,* 556 U.S. 396, 409, 129 S.Ct. 1696, 1706, 173 L.Ed.2d 532 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"); *Nelson v. Apfel,* 131 F.3d 1228, 1236 (7th Cir. 1997) (Social Security claimant must demonstrate prejudice by ALJ error)); *Ritz v. Colvin*, No. 115CV00388CCCGBC, 2016 WL 1458914, at *9 (M.D. Pa. Mar. 9, 2016),

*report and recommendation adopted,* No. 1:15-CV-388, 2016 WL 1450181 (M.D. Pa. Apr. 13, 2016) (Brief submitted by Attorney Niven "asserts only that 'the ALJ erred by considering numerous ailments to be nonsevere: hypertension, hypothyroidism, plantar calcaneal spur of the left foot, left ankle sprain and right knee sprain. (Tr. 16) This is contrary to SSR 96–3p and limitations stemming from the aforesaid impairments could have further eroded sedentary base.' (Pl. Brief at 20). Plaintiff also asserts that the ALJ "failed to consider" Plaintiff's depression. (Pl. Brief at 21). These are generalized responses that, pursuant to *Rutherford,* are insufficient to establish the need for a remand. *Rutherford,* 399 F.3d at 553. Plaintiff has failed to identify work-related limitations arising out of these impairments that would preclude her from performing sedentary work. *See* Local Rule 83.40.4(b); *Whitehill,* 2015 WL 1201393, at *9; *Phillips,* 515 F.3d at 231–32; *Kiewit Eastern Co., Inc.*, 44 F.3d at 1203–04; *Crawford,* 541 U.S. at 68 (2004)"); *Cleland v. Colvin*, No. 3:14-cv-1235 (M.D. Pa. Sept. 15, 2015) (Briefs submitted by Attorney Niven "assert[ing] that the ALJ failed to address her obesity, 'which could…exacerbate [her sleep disturbances]'" and that Plaintiff's "weight could affect her ability to sit, stand, walk, lift, carry, twist, bend, and climb stairs and ladders" was a "generalized response…not enough to require a remand");

In each of these cases, the undersigned identified *Rutherford* as the controlling Third Circuit case regarding harmless error at step two. *Id.* In Plaintiff's briefs here, Attorney Niven does not acknowledge *Rutherford* or identify any reason to distinguish

this case from *Rutherford*. (Pl. Brief); (Pl. Reply). She makes a generalized response that PTSD was "significant enough to affect her ability to do basic work activities…[she] had a significant abuse history…reported that she has feeling of anger and resentment toward others..her symptoms were noted to include flashbacks of molestation nightmares, avoidant behavior, irritability, anger, decreased sleep and appetite, tearfulness and passive suicidal ideation." (Pl. Reply).  As the Court has explained to Attorney Niven in the above-described cases, this is insufficient. *See Rutherford,* 399 F.3d at 553. None of these alleged diagnoses or symptoms address specific work-related activities. *Id.*; *see also Jones v. Sullivan*, 954 F.2d 125, 128 (3d Cir. 1991) (There is no "presumption that a mere diagnosis…renders an applicant eligible for benefits under the Social Security Act"). Moreover, as discussed below, Dr. Crosson's opinion provides substantial evidence for the conclusion that Plaintiff did not meet a Listing and did not need any additional limitations in the RFC. (Tr. 287-95). Consequently, the Court does not find that remand is appropriate to correct this error and does not recommend remand on these grounds. *See Rutherford v. Barnhart*, 399 F.3d 546, 552-53 (3d Cir. 2005).

### b.    Listing 1.02A

Plaintiff asserts that the ALJ erred in finding that she did not meet Listing 1.02A. (Pl. Reply at 2-4) (citing Tr. 34, 273-76, 394, 398, 349, 352, 396). As the undersigned has explained in another case involving Plaintiff's counsel:

> Plaintiff asserts that she meets 20 C.F.R. Part 404, Subpart P, Appendix, §
> 1.02(A) ("Listing 1.02(A)"). (Pl. Brief at 13–17); (Pl. Reply). *Sullivan v.*

*Zebley,* 493 U.S. 521, 532 (1990). A claimant must establish every element of a Listing. *See Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). Listing 1.02(A) requires an inability to ambulate. *Id.* The Listings provide that:

> Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. "Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."

*Id.* § 1.00(B)(2)(b).

Plaintiff asserts that her medical records show "positive objective findings ... as well as her inability to ambulate effectively." (Pl. Brief at 17). Plaintiff cites her diagnostic imaging, objective findings, treatment, subjective reports of pain, and use of a quad cane in a single hand. (Pl. Brief at 13–17).

First, even accepting Plaintiff's claims as true, there is no evidence that she required two canes or a walker to ambulate. Doc. 10; (Pl. Brief); (Pl. Reply). Listing requirements are strict, representing "a higher level of severity than the statutory standard." *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990). Plaintiff's allegation that she needs a cane in one hand to ambulate does not meet the definition of inability to ambulate within the meaning of Listing 1.02(A). *Bullock v. Comm'r of Soc. Sec.,* 277 Fed.Appx. 325, 328 (5th Cir. 2007) (Claimant was able to walk with the help of a single cane, as opposed to a walker, two crutches or two canes, climb stairs with the use of a handrail and could walk two blocks at one time); *Jones v. Colvin,* No. 1:13–CV–02161–GBC, 2014 WL 4796491, at *10 (M.D. Pa. Sept. 26, 2014) ("Plaintiff does not assert that she ever needs to use a walker, two crutches, or two canes, and needing to use a cane 'periodically' does not constitute an "inability" to ambulate without a cane." Similarly, being unable to live in second floor apartment does not indicate that Plaintiff would be unable to "climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* With regard to Plaintiff's "stiff pattern" and "difficulty with transitional movements," neither rise to the level of inability to ambulate contemplated by the regulations. "Moreover, the treatment record indicates that, while Plaintiff had difficulty getting into and out of a chair during her appointment[s]"); *Lefevre v. Colvin,* No. 3:12–CV–00787–GBC, 2014 WL 4293983, at *8 (M.D. Pa. Aug. 29, 2014); *McCleave v. Colvin,* No. 3:12–

CV–01161–GBC, 2014 WL 4060030, at *10 (M.D. Pa. Aug. 15, 2014) ("Plaintiff must show the inability to walk without two canes, not one. Given her testimony that she only uses one cane to ambulate, Plaintiff fails to meet her burden of showing an inability to ambulate") (internal citation omitted); *Godfrey v. Astrue,* No. 10–565, 2011 WL 1831582, at *6 (W.D.Pa. May 12, 2011); *Demcyk v. Astrue,* No. 10–239, 2010 WL 4257599, at *7 (W.D.Pa. Oct. 21, 2010).

Second, Plaintiff's gait was observed to be normal at times. (Tr. 603–05, 760, 861). *See Morrison v. Comm'r of Soc. Sec.,* 355 Fed.Appx. 599, 601 (3d Cir. 2009) (Claimant did not exhibit inability to ambulate effectively where she had a negative straight leg-raising test, normal strength, normal range of motion, normal gait, no atrophy in her lower extremities and no restricted hip rotation).

Third, diagnoses and objective findings, such as an antalgic gait, do not establish that Plaintiff suffers an inability to ambulate within the meaning of Listing 1.02(A). No physician opined that Plaintiff was so limited in ambulating that she met the definition of inability to ambulate within the meaning of Listing 1.02(A). Doc. 10. The only evidence that Plaintiff was so limited in ambulating that she met the definition of inability to ambulate within the meaning of Listing 1.02(A) were her subjective claims. Doc. 10; (Pl. Brief at 13–17); (Pl. Reply). The Act requires Plaintiff to produce evidence establishing her disability. *See* 42 U.S.C. § 423(d)(5)(A); 42 U.S.C.A. § 1382c(a)(3)(H)(i) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). The ALJ properly found that Plaintiff's subjective claims were not fully credible. *Supra.* A reasonable mind could find that Plaintiff's subjective claims failed to meet the strict requirements of Listing 1.02(A). Substantial evidence supports the ALJ's Listing assessment.

*Ritz v. Colvin*, No. 115CV00388CCCGBC, 2016 WL 1458914, at *13-14 (M.D. Pa. Mar. 9, 2016), *report and recommendation adopted,* No. 1:15-CV-388, 2016 WL 1450181 (M.D. Pa. Apr. 13, 2016). Here, Plaintiff cites her testimony that a cane had been prescribed to her, (Tr. 34), but, as discussed below, there is no evidence that any physician prescribed or mentioned a cane. *Infra*. She cites Dr. McLaughlin's

examination, but Dr. McLaughlin opined that she could walk for one to two hours without the use of a cane. (Tr. 273-76). She cites abnormalities on diagnostic imaging in her right knee, (Tr. 394, 398), but the presence of objective abnormalities does not demonstrate that she has an inability to ambulate effectively as a result of those abnormalities. She cites her ankle sprain and treatment in November of 2012, but there is no evidence of any other treatment for her ankle. (Tr. 349, 352, 396). Like the claimant in *Ritz*, Plaintiff's ability to walk with an antalgic gait independently, without a walker or two canes, precludes the Court from finding that she meets the definition of inability to ambulate. *Ritz v. Colvin*, No. 115CV00388CCCGBC, 2016 WL 1458914, at *13-14 (M.D. Pa. Mar. 9, 2016), *report and recommendation adopted,* No. 1:15-CV-388, 2016 WL 1450181 (M.D. Pa. Apr. 13, 2016). Consequently, Plaintiff does not cite any evidence that supports her claim that she is unable to ambulate effectively. (Pl. Brief); (Pl. Reply).

Plaintiff asserts that the ALJ failed to provide sufficient explanation. (Pl. reply at 2-4). If explanation allows meaningful judicial review, it suffices. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record

and explanation of findings to permit meaningful review."); *Hur v. Comm'r Soc Sec.*, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record"). The Court does not recommend remand on these grounds.

### c.    Listing 12.04 and 12.06

Plaintiff asserts that she meets Listings 12.04 and 12.06 because she has a marked limitation in social functioning and a marked limitation in concentration, persistence, and pace. (Pl. Reply at 4-6) (citing Tr. 291, 294, 305, 308, 310, 312, 435, 440).

She cites Dr. Vaglica's opinion. (Tr. 308). However, as discussed below, the ALJ properly assigned little weight to Dr. Vaglica's opinion. *Infra*. She cites Dr. Vaglica's observation of depressed and angry mood and her subjective self-reported symptoms, but these do not establish marked limitations. (Tr. 291, 294, 305, 308, 310, 312, 435, 440). Dr. Crosson opined that Plaintiff did not meet Listing 12.04 or 12.06, and Dr. Crosson's opinion provides substantial evidence for the ALJ's finding.

### d.    Dr. Vaglica's opinion

Dr. Vaglica opined that Plaintiff had marked mental health limitations. (Tr. 304-08). Plaintiff asserts that the ALJ erred in finding that Dr. Vaglica's opinion was not entitled to controlling weight and for discounting Dr. Vaglica's opinion as inconsistent with her treatment notes. (Pl. Brief at 23-26); (Pl. Reply at 6-10) (citing Tr. 304-08). Plaintiff does not cite any evidence other than Dr. Vaglica's opinion. (Pl. Brief at 23-26);

(Pl. Reply at 6-7). The ALJ provided "good reasons" to credit Dr. Crosson's examining opinion over Dr. Vaglica's treating opinion. *See* 20 C.F.R. §404.1527(c)(2). Despite the treating source rule, the Court would refuse to direct a verdict in Dr. Vaglica's favor if this issue was before a jury. *See Reefer*, 326 F.3d at 379. Substantial evidence supports the ALJ's assignment of weight to the medical opinions.

Plaintiff asserts that Defendant failed to cite "valid inconsistent medical evidence to support the ALJ's reasoning" with regard to Dr. Vaglica. (Pl. Reply at  7). However, Defendant and the ALJ cited Dr. Crosson's opinion, along with other evidence. (Def. Brief at 22). Moreover, an ALJ may reject a treating source medical opinion when non-medical evidence is inconsistent with the opinion. As the Court has explained:

> An ALJ is entitled, in "extremely rare" circumstances, to reject a treating opinion based on "non-medical" evidence, which does not require expert interpretation. Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932–01 at 36936. However, the "non-medical" evidence must be truly "inconsistent" with the opinion. *Id.*; *see also Torres v. Barnhart*, 139 Fed.Appx. 411, 414 (3d Cir.2005) (ALJ permissibly rejected treating opinion "in combination with other evidence of record including Claimant's own testimony"); *Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir.2005) ("the ALJ's decision fails to explain how Chunn's activities and behaviors are inconsistent with Dr. Ziolkow's characterization of her mental capacity."); *Marr v. Colvin*, No. 1:13–cv–2499, *Report and Recommendation* at *44, 52 (M.D.P.A. April 15, 2015) (District Court adopted a recommendation from the undersigned that the claimant's appeal be denied where physicians opined that the claimant could not sit for more than forty-five minutes total out of an eight-hour workday but the claimant testified that she was regularly able to sit for up to five hours at a time).

*Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269, at *1 (M.D. Pa. Jan. 13, 2016);

*see also Tilton v. Colvin*, No. 1:14-CV-02219-YK-GBC, 2016 WL 1580003, at *1 (M.D.

Pa. Mar. 31, 2016), *report and recommendation adopted,* No. 1:14-CV-2219, 2016 WL 1569895 (M.D. Pa. Apr. 19, 2016) ("Unlike medical evidence, interpreting non-medical evidence does not require specialized medical expertise" (citing Fed.R.Evid. 702, 1972 Advisory Committee Notes;  Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952)). Thus, the ALJ is not necessarily required to cite contradictory medical evidence.

Plaintiff also asserts that Defendant "absolutely does not provide any support for th[e] assertion" that Plaintiff "was doing fairly well with her treatment regimen." (Pl. Reply at 7) (citing Def. Brief at 22). However, Defendant writes that:

> On September 26, 2012, only one month after she completed her questionnaire, Dr. Vaglica noted that Plaintiff's condition was stable and rated her GAF score at 55, indicating only moderate psychological symptoms (Tr. 454). One month later, on October 29, 2012, Dr. Vaglica indicated that Plaintiff's mood was "quite stable lately and is happy" (Tr. 433).

(Def. Brief at 22).

Aside from arguing that there was "no inconsistent evidence" and that Defendant did not provide support, Plaintiff does not identify any other reason why the ALJ was not entitled to credit Dr. Crosson's opinion over Dr. Vaglica's opinion. (Pl. Brief at 23). Plaintiff does not acknowledge Dr. Crosson's opinion in this section. (Pl. Brief at 23). Plaintiff asserts that the ALJ should have assigned controlling weight to Dr. Vaglica's opinion, but controlling weight may only be assigned when there is no inconsistent substantial evidence. *See* 20 C.F.R. §404.1527(c)(2). Dr. Crosson's opinion provides

inconsistent substantial evidence, so Dr. Vaglica's opinion was not entitled to controlling weight. *Id.*

When the ALJ does not assign controlling weight to a treating source opinion, ALJ applies the factors in 20 C.F.R. §404.1527(c). Section 404.1527(c)(1) provides that, "[g]enerally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion." *Id.* When a physician's opinion is based on subjective, rather than objective, information, and the ALJ has properly found a claimant's subjective claims to be less than fully credible, an ALJ may assign less weight to the opinion:

> [T]he mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion. *Craig v. Chater*, 76 F.3d 585, 590 n. 2 (4th Cir.1996). An ALJ may discredit a physician's opinion on disability that was premised largely on the claimant's own accounts of her symptoms and limitations when the claimant's complaints are properly discounted. *Fair v. Bowen*, 885 F.2d 597, 605 (9th

Cir.1989) ("The ALJ thus disregarded Dr. Bliss' opinion because it was premised on Fair's own subjective complaints, which the ALJ had already properly discounted. This constitutes a specific, legitimate reason for rejecting the opinion of a treating physician.").

*Morris v. Barnhart*, 78 Fed.Appx. 820, 824-25 (3d Cir. 2003).

Plaintiff asserts that the ALJ is required to weigh the evidence using the factors in 20 C.F.R. §404.1527 and provide sufficiently specific explanation for the assignment of weight. (Pl. Brief at 23). The Court agrees, but finds that the ALJ did so. Plaintiff does not elaborate how the ALJ allegedly misapplied the factors or failed to provide explanation. (Pl. Brief at 23-24). The ALJ wrote that Dr. Vaglica's opinion was "not supported by actual treatment records as actual treatment records indicate far less problems." (Tr. 17). The ALJ assigned great weight to Dr. Crosson's opinion because it was "supported by the record." (Tr. 17). These are permissible rationales allowed by 20 C.F.R. §404.1527(c). *See* 20 C.F.R. §404.1527(c)(3) ("[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion."). *Id.* Plaintiff fails to explain why the ALJ was not entitled to rely on these rationales. (Pl. Brief); (Pl. Reply). An independent review indicates that they are accurate characterizations of the record.

Dr. Vaglica opined that Plaintiff would suffer four or more episodes of decompensation lasting two weeks or more in a twelve month period. (Tr. 308). Episodes

of decompensation were defined on the form as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning…Episodes of decompensation may be demonstrated by an exacerbation of symptoms or signs that would ordinarily required increased treatment or a less stressful situation (or a combination of both)." (Tr. 308). The Regulations define episodes of decompensation:

> Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, §12.00(C)(4).

However, there is no evidence that Plaintiff experienced any exacerbation of symptoms that required increased treatment or a less stressful situation, much less four episodes lasting two weeks or more in a twelve month period. In other cases involving Plaintiff's counsel, the Court has found that these extreme limitations were inconsistent with the record. *See Tolbert v. Colvin*, No. 114CV02194CCCGBC, 2016 WL 1458236, at *11 (M.D. Pa. Mar. 11, 2016), *report and recommendation adopted,* No. 1:14-CV-2194, 2016 WL 1450168 (M.D. Pa. Apr. 13, 2016) ("Dr. Ibikunle opined that Plaintiff experienced three "episodes of decompensation within a twelve month period, each of at least two weeks duration." (Tr. 528). The form defined episodes of decompensation as "an exacerbation of symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two)." (Tr. 528). There is no evidence

in the record that Plaintiff received increased treatment or changed his living situation at any point, much less three times for at least two weeks."); *Gorby v. Colvin*, No. 3:14-cv-2195 (M.D. Pa. Mar. 19, 2016) (Treating physician opined claimant "had three or more episodes of decompensation, defined as 'an exacerbation of symptoms or signs that would ordinary require increased treatment or a less stressful situation (or a combination of the two),' but the ALJ properly found that "[a]s for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration" where claimant experienced no hospitalizations during the relevant period) (citing *Golzak v. Colvin*, No. 3:12CV2247, 2014 WL 980752, at *5 (M.D. Pa. Mar. 13, 2014) (Munley, J.) ("Plaintiff cites to no evidence before the ALJ that indicated such a complete inability to function outside of his home"); *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 116-17 (3d Cir. 2012) (ALJ properly found that claimant had not experienced "repeated episodes of decompensation, observing that [claimant] had never been hospitalized for a mental condition."); *Prasnikar v. Colvin,* No. 3:13-CV-743, 2014 WL 4792121, at *12 (M.D. Pa. Sept. 24, 2014); *Schmits v. Astrue*, 386 F. App'x 71, 74 (3d Cir. 2010).

Plaintiff asserts that Defendant provides no support for the claim that Plaintiff "was doing fairly well with her treatment regimen." (Pl. Reply at 6-7) (citing Def. Brief at 21, 22, Tr. 304-08). However, Defendant notes that Dr. Vaglica based on opinion on symptoms that were contradicted by the record, like that she was "quite happy." (Def.

Brief at 21-22). This is accurate. Dr. Vaglica relied on symptoms like psychomotor agitation or retardation, difficulty thinking or concentrating, and recurrent severe panic attacks. (Tr. 305). Plaintiff has not identified anywhere in the Dr. Vaglica's records where these symptoms are documented; instead, the records show she reported "normal energy and concentration." (Tr. 440). All of Dr. Vaglica's subsequent treatment records contradicted other symptoms noted in her opinion, like appetite disturbance, decreased energy, abnormal affect, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, persistent disturbances of mood or affect, emotional lability, and sleep disturbance. (Tr. 305). In September and October of 2012, Dr. Vaglica noted that Plaintiff was "stable," with a GAF of 55, and that she was "quite stable lately and happy." (Tr. 433, 454). Mental status examination in October and December of 2012 and February of 2013 indicated no medication side effects, clean grooming, normal sleep, normal appetite, no suicidal or homicidal thoughts, neutral mood with no depression or anger, cooperative behavior, and organized speech and thought process. (Tr. 432-33). Plaintiff reported in December that she had stable mood, was sleeping and eating well, no current stressors, and was reading, watching television, and visiting with her family. (Tr. 432). In February of 2013, she reported stable mood, adequate sleep and appetite. (Tr. 431). She did not treat with Dr. Vaglica thereafter. Doc. 10.

These contradictions do not require inference. Dr. Vaglica based her opinion on appetite disturbance, persistent disturbances of mood or affect, and sleep disturbance, but

every subsequent record affirmatively indicated normal appetite, mood, and sleep. (Tr. 304-09). The extent to which an opinion is consistent with the record and supported by the evidence are factors the Regulations explicitly allow the ALJ to utilize. *See* 20 C.F.R. §404.1527(c)(3)-(4). Plaintiff does not acknowledge these contradictions, and instead asserts only that there is "no support" for the premise that Dr. Vaglica's treatment notes contradicted her opinion. (Pl. Brief at 23-26); (Pl. Reply at 6-9). Because Plaintiff does not acknowledge these contradictions, she provides no reason why the ALJ was not entitled to rely on these contradictions. *Id.*; *see also* Local Rule 84.40.4(b) ("The court will consider only those errors specifically identified in the briefs.").

The ALJ provided "good reasons" to assign more weight to Dr. Crosson's opinion and Plaintiff's therapist's statement than Dr. Vaglica's opinion. *See* 20 C.F.R. §404.1527(c)(2). The Court would refuse to direct a verdict in Plaintiff's favor if the issue were before a jury. *See Reefer*, 326 F.3d at 379. The ALJ's rationale that Dr. Crosson's opinion was more supported by the record allowed for meaningful judicial review. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient

development of the record and explanation of findings to permit meaningful review.").
The Court does not recommend remand on these grounds.

Plaintiff asserts that the ALJ was required to recontact Dr. Vaglica because SSR 96-5p provides that "[f]or treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us." (Pl. Brief at 25). However, Dr. Vaglica's opinion was not on an issue reserved to the Commissioner. (Tr. 304-09). The form completed by Dr. Vaglica offered her ample opportunity to identify any supporting findings for her opinion. (Tr. 304-09). The form instructed Dr. Vaglica to "describe the clinical findings including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms." (Tr. 304).  There is no evidence the ALJ was unsure as to the basis of her opinion. (Tr. 16-17). Thus, the ALJ was not required to recontact Dr. Vaglica.

### e.    PA-C Apke's statement

Plaintiff asserts that the ALJ erred in evaluating PA-C Apke's statement.(Pl. Brief);(Pl. Reply). If the ALJ erred, any error was harmless, because PA-C Apke's statement supports the denial of benefits. To receive benefits under the Act, a claimant must establish disability "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). PA-C Apke opined that Plaintiff would be

disabled, but only for seven months, and not twelve months or more. (Tr. 283). He opined

that she was not "a candidate for Social Security Disability or SSI." (Tr. 283).

The Court does not recommend remand on this ground.

### f.      GAF Scores

Plaintiff asserts that a "GAF of 48 is consistent with a finding of disability." (Pl.

Reply at 9). However, a GAF of 48 is also consistent with a finding of non-disability.

This is because:

> The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two.

*Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23,

2014). Thus, a GAF score of 60 indicates that neither the claimant's function nor

symptoms are more than mild. *Id.*  In contrast, a GAF score of 48 indicates that either the

claimant's function or symptoms are severe, but not necessarily both. *Id.* ("[A]suicidal

patient who is gainfully employed would have a GAF rating below 20."). Consequently,

Plaintiff fails to demonstrate that the ALJ erred in concluding that a GAF of 48 "does not

mean that Plaintiff cannot work." (Tr. 17). Even a GAF of 20 does not mean that a

claimant cannot work. *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014). The Court does not recommend remand on these grounds.

### g.    Vocational evidence

Plaintiff asserts that the ALJ erred in relying on vocational expert testimony that a claimant with her RFC could perform the jobs identified by the VE. (Pl. Reply at 10-12). First, she asserts that a limitation to standing no more than one or two hours is inherently inconsistent with the regulatory definition of light work. (Pl. Reply at 10-11) (citing SSR 83-10). However, the Regulations, not SSR 83-10, defines light work. (Pl. Brief at 26-28); (Pl. Reply at 10) (citing SSR 83-10). The definition of light work requires only that claimant can carry, lift, or exert force *up to* twenty pounds occasionally or *up to* ten pounds frequently. *See* 20 C.F.R. § 404.1567(b); Dictionary of Occupational Titles 762.687-014.[5] Although light work is typically considered to require six hours of standing or walking in an eight hour workday, this is not consistent with the regulatory definitions. *See* 20 C.F.R. § 404.1567(b); Dictionary of Occupational Titles 762.687-014. Even when the amount lifted is negligible, a job can be considered light even if it is "primarily sitting" if it involves the operation of foot or hand controls or requires production paced work. *Id.* An RFC for sitting six hours out of an eight-hour workday is not inherently inconsistent with the definition of light work. *Id.* Thus, the ALJ was

---

[5] A claimant could also meet the definition of light work if they were unable to lift these amounts, but met certain other criteria. *See* 20 C.F.R. § 404.1567(b); Dictionary of Occupational Titles 762.687-014.

entitled to rely on VE testimony that Plaintiff could perform the positions classified as light work. *See* SSR 00-4p. Similarly, Plaintiff's allegation that an option to alternate between sitting and standing is inconsistent with light work fails, because it is not inconsistent with the actual language of the regulatory definition. *See* 20 C.F.R. § 404.1567(b). Even if Plaintiff successfully argued that standing for two hours or less is inconsistent with light work, the VE also testified that there were sedentary jobs that Plaintiff could perform. (Tr. 42). Plaintiff does not acknowledge this testimony. (Pl. Reply at 10-12).

Second, Plaintiff asserts that a limitation to sitting or standing "at will" is not sufficiently specific. (Pl. Brief at 28-29); (Pl. Reply at 11-12). Judge Conoboy has remarked that this argument from Plaintiff's counsel "borders on the disingenuous," writing:

> Plaintiff argues here that the ALJ's requirement that the Plaintiff work only at a job where she "can alternate sitting and standing at will" is "too vague to determine the extent of the erosion on the occupational base." (R.21 and Doc. 11 at 21). This argument borders on the disingenuous.
>
> The ALJ's directive that the Plaintiff may sit or stand "at will" constitutes a clear direction that it is for the Plaintiff to determine when and for how long she sits or stands. There is no indication that the VE was in any manner confused by this directive. Plaintiff's argument unaccountably suggests that the ALJ's directive would *require* the Plaintiff to sit and stand for specified periods of time. Plaintiff's interpretation of the ALJ's "sit/stand at will" requirement is simply inaccurate and the Court finds that the VE properly factored the "sit/stand at will" requirement into her analysis of what jobs the Plaintiff could perform. Accordingly, the VE's assessment of the Plaintiff's employability was appropriately credit by the ALJ.

*Nicholson v. Colvin*, No. 3:14 CV-1819, 2015 WL 1275365, at *10 (M.D. Pa. Mar. 19, 2015) (Conoboy, J.)

Plaintiff's counsel has made this argument, unsuccessfully, in several other cases. *See Orndorff v. Colvin*, No. 114CV02465CCCGBC, 2016 WL 1458408, at *13 (M.D. Pa. Mar. 9, 2016), *report and recommendation adopted,* No. 1:14-CV-2465, 2016 WL 1450172 (M.D. Pa. Apr. 13, 2016); *Ritz v. Colvin*, No. 115CV00388CCCGBC, 2016 WL 1458914, at *15 (M.D. Pa. Mar. 9, 2016), *report and recommendation adopted,* No. 1:15-CV-388, 2016 WL 1450181 (M.D. Pa. Apr. 13, 2016); *Nicholson v. Colvin,* No. 3:14 CV–1819, 2015 WL 1275365, at *10 (M.D. Pa. Mar. 19, 2015) ("'at will' constitutes a clear direction that it is for the Plaintiff to determine when and for how long she sits or stands"). Consistent with these cases, the Court concludes that "at will" is sufficiently specific. *See also Torres v. Colvin,* No. 3:14–cv–00144 (M.D. Pa. Oct. 30, 2015); *Minichino v. Colvin,* 955 F.Supp.2d 366, 381 (M.D. Pa. 2013) (A requirement to sit or stand at will constitutes "shorthand language in matters about which the ALJ and VE are well versed"). The Court does not recommend remand on these grounds.

### h.    Cane

Plaintiff asserts that the ALJ "failed to address how [Plaintiff's] use of a cane impacts her ability to do light work." (Pl. Reply at 12). Defendant responds that:

> [T]here is no evidence in the record that Plaintiff ever required a cane or was prescribed a cane by any of her physicians. Dr. McLaughlin noted that Plaintiff presented to her consultative examination without any ambulatory aids (Tr. 273). Although Plaintiff subsequently required surgery to correct a

right ankle fracture, her surgeon, Dr. Lippe, never mentioned any need for a cane (Tr. 387-88). Six weeks after Plaintiff's surgery, Dr. Lippe advised her that she could perform activities as tolerated and that she should engage in physical therapy (Tr. 387). He did not mention or prescribe a cane (Tr. 387). None of Plaintiff's other physicians mention the use of a cane in any of their treatment records.

(Def. Brief at 29). In Reply, Plaintiff does not cite any medical records documenting her use of or prescription for a cane. (Pl. Reply at 12). She simply repeats her subjective testimony that it had been prescribed to her. (Pl. Reply at 12). SSR 96-9p provides that, "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." *Id.* Substantial evidence supports the ALJ assessment of Plaintiff's need for a cane, and the Court does not recommend remand on these grounds.

### i.      Credibility

Plaintiff asserts that the ALJ erred in assessing her credibility. (Pl. Reply at 13-15). When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

[T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this

purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. "Under this evaluation, a variety of factors are considered, such as: (1) 'objective medical evidence,' (2) 'daily activities,' (3) 'location, duration, frequency and intensity,' (4) medication prescribed, including its effectiveness and side effects, (5) treatment, and (6) other measures to relieve pain." *Daniello v. Colvin*, CIV. 12-1023-GMS-MPT, 2013 WL 2405442 (D. Del. June 3, 2013) (citing 20 C.F.R. § 404.1529(c)).

Here, the ALJ found that Plaintiff was less than fully credible based on the objective medical evidence, her activities of daily living, her conservative treatment, and her inconsistent claims. (Tr. 16-17). Plaintiff disagrees that objective medical evidence undermines her claims. (Pl. Reply at 13-14). Plaintiff cites a variety of objective findings. (Pl. Reply at 13-14). Plaintiff asserts that her activities of daily living do not indicate that she can work "in a full-time position, on a basis of eight hours per day, five days per week, or the equivalent." (Pl. Reply at 14). However, even assuming both of these rationales were flawed, substantial evidence will still support the ALJ's credibility determination if the other rationales provide substantial evidence. *See Brumbaugh v. Colvin*, 3:14-CV-888, 2014 WL 5325346, at *16 (M.D. Pa. Oct. 20, 2014) ("whether [an] error is harmless depends on whether the other reasons cited by the ALJ in support of her

credibility determination provide substantial evidence for her decision"). Defendant notes that the ALJ also relied on Plaintiff's conservative treatment. (Def. Brief at 32) (citing Tr. 16). Plaintiff does not reply to this contention. (Pl. Reply). Plaintiff's conservative treatment is a proper reason for the ALJ to find her less than fully credible. *See* 20 C.F.R. §404.1529; SSR 96-7p.

Moreover, the Court disagrees that the ALJ's analysis of the objective medical evidence was flawed. As discussed above, the ALJ properly credited the opinions of Dr. McLaughlin and Dr. Crosson. *Supra.* Plaintiff's activities of daily living may not rise to the level of substantial gainful activity, but they do demonstrate inconsistencies. As the undersigned explained in another case involving Plaintiff's counsel:

> Sporadic and transitory activities of daily living do not establish that a claimant can perform substantial gainful activity, *see Fargnoli v. Massanari,* 247 F.3d 34, 44 (3d Cir.2001), but may be used to show that a claimant's allegations are inconsistent. *See* SSR 96–7p ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."); *Horodenski v. Comm'r of Soc. Sec.,* 215 F. App'x 183, 189 (3d Cir.2007) ("Horodenski's testimony about her daily activities is not merely significant because of its substance; it was also significant because it was internally inconsistent, which aided the ALJ in determining how much weight to afford to Horodenski's testimony.").

*Vargas v. Colvin*, No. 1:14-CV-02407-YK-GBC, 2016 WL 1084966, at *15 (M.D. Pa. Jan. 14, 2016), *report and recommendation adopted,* No. 14-CV-02407, 2016 WL 1076049 (M.D. Pa. Mar. 18, 2016). The ALJ relied on these inconsistencies, writing

"[h]er allegation that she cannot lift a plate of food is not credible and reflects poorly on her overall credibility." (Tr. 16). Plaintiff does not address this rationale.

Plaintiff's allegations boil down to an argument that the weight of the evidence supported her credibility. However, the ALJ is entitled to deference with regard to credibility determinations. *See Szallar v. Comm'r Soc. Sec.*, No. 15-1776, 2015 WL 7445399, at *1 (3d Cir. Nov. 24, 2015) ("the ALJ's assessment of his credibility is entitled to our substantial deference") (citing *Zirnsak v. Colvin*, 777 F.3d 607, 612–13 (3d Cir.2014)). Moreover, "[n]either the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir.2011) ("Courts are not permitted to re-weigh  the evidence or impose their own factual determinations") (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Plaintiff identifies some factors that weigh in favor of her credibility. However, Plaintiff fails to demonstrate that no reasonable mind would accept the medical opinions, conservative treatment, and inconsistent claims to conclude that she was not fully credible. *See Richardson v. Perales*, 402 U.S. at 401 (1971). The Court does not recommend remand on these grounds.

###### j.      Third-party statement

Plaintiff asserts that the ALJ erred in assessing her mother's statement. (Pl. Reply at 14-15) (citing 20 C.F.R. §404.1513(d); 416.913(d); SSR 06-3p). Plaintiff notes that information from other sources "may provide insight" into the claimant's disability. (Pl. Reply at 14) (citing 20 C.F.R. §404.1513(d); 416.913(d); SSR 06-3p). However, this does not mean that the ALJ is required to adopt and credit her mother's statement. *Id.* Plaintiff asserts that the ALJ did not provide "a single legitimate reason" for rejecting her mother's statement. (Pl. Reply at 15). Plaintiff specifically asserts that the ALJ's rationale was "generic" and that, "if given full effect, would render the testimony or report of any family member meaningless." (Pl. Reply at 15). *Cf. Shoemaker v. Colvin*, No. 114CV02049SHRGBC, 2015 WL 9690310, at *14 (M.D. Pa. Dec. 18, 2015), *report and recommendation adopted,* No. 1:14-CV-2049, 2016 WL 107962 (M.D. Pa. Jan. 11, 2016) (ALJ erred by "reject[ing] Plaintiff's aunt's testimony solely because she allegedly had 'an interest' in Plaintiff obtaining benefits"); *Maellaro v. Colvin*, No. 3:12-CV-01560, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014).

The ALJ also wrote that "[t]his report mirrors many of the claimant's statements and added little probative value to the file." (Tr. 17). This may be generic, but, unlike treating source medical opinions, the ALJ may support his analysis of third-party testimony with generic reasons, as long as the Court can meaningfully review the analysis. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,*

730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."). Plaintiff's mother is entitled to no special deference. *See* 20 C.F.R. §404.1527(a). Defendant is precluded from offering a post-hoc rationalization that the third-party testimony is cumulative, but the ALJ is not precluded from utilizing this rationale in the first instance. *See Burnett v. Comm'r of Soc. Sec. Admin.,* 220 F.3d 112, 122 (3d Cir.2000).

Plaintiff has provided no argument why the ALJ was not entitled to conclude that her mother's statement was cumulative and of little probative value for the same reasons that her testimony was found less than fully credible. (Pl. Brief); (Pl. Reply). The Court concludes that the ALJ decision, as a whole, shows that he found that Plaintiff's mother's statement was of little probative value based on Dr. Crosson's opinion, Dr. McLaughlin's opinion, the objective medical evidence, conservative treatment, and inconsistent claims. (Tr. 14-17). For instance, Plaintiff's statement that she could not lift "a plate of food" was inconsistent with her mother's report that she could iron, do laundry, and care for her personal needs. (Tr. 30, 35, 170, 183).   Plaintiff fails to demonstrate that no reasonable mind would accept the medical opinions, conservative

treatment, and inconsistent claims to conclude that her mother was not fully credible. *See Richardson v. Perales*, 402 U.S. at 401 (1971). The Court does not recommend remand on these grounds.

## VI.   Conclusion

The Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires "more than a mere scintilla" but is "less than a preponderance." J*esurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Here, a reasonable mind might accept the relevant evidence as adequate.    Accordingly, it is HEREBY RECOMMENDED:

I.    This appeal be DENIED, as the ALJ's decision is supported by substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: August 25, 2016          _____s/Gerald B. Cohn_____
                                GERALD B. COHN
                                UNITED STATES MAGISTRATE JUDGE